UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN C. KELLY,

                                   Plaintiff,                DECISION AND
                                                               ORDER

-vs-

                                                               11-CV-06614-CJS

DR. J.TAN, M.D., KEN JIN, M.D., ROBERT
CIEPIELA, DPM, EILEEN DINISIO,
MRS. SAMUELSON, KAREN BELLAMY,

                                  Defendants.

_____

APPEARANCES

        For Plaintiff:      John C. Kelly, *Pro se*
                              592 Wales Avenue, Apt. E
                              Bronx, NY 10455

        For Defendants:   Hillel Deutsch, A.A.G.
                              New York State Attorney General's Office
                              Department of Law
                              144 Exchange Boulevard
                              Rochester, NY 14614

INTRODUCTION

      Plaintiff, John C. Kelly ("Plaintiff" or "Kelly"), formerly an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that while he was incarcerated at Collins Correctional Facility ("Collins"), Defendants acted with deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, by declining to provide him with surgery to remove a small piece of glass that was embedded in his foot.  Now before the Court is Defendants' motion for summary judgment (Docket No. [#26]).  The application is granted in part and denied in part.

1

BACKGROUND

This is Defendants' second summary judgment motion in this action, and the reader is presumed to be familiar with the Court's Decision and Order [#12] denying Defendants' first, pre-discovery motion. *See, Kelly v. Tan*, 2013 WL 4811913 (W.D.N.Y. Sep. 10, 2013). Unless otherwise noted the following are the facts of the case, most of which are taken from Plaintiff's DOCCS Ambulatory Health Record.[1]

This action arose when Plaintiff was confined at Collins between 2010 and 2012. At all relevant times, Joseph Tan, M.D. ("Tan") was a medical doctor employed as Health Services Director at Collins, Ken Jin, M.D. ("Jin") was a physician at Collins, Robert Ciepiela, DPM ("Ciepiela") was a licensed podiatrist at the Foot Care Center of Buffalo who provided podiatric care to DOCCS inmates, Eileen DiNisio ("DiNisio") was DOCCS' Regional Health Services Administrator, Karen Bellamy ("Bellamy") was DOCCS' Director of the Inmate Grievance Program, and Nurse Administrator Samuelson ("Samuelson") was Nurse Administrator at Collins.

In 2006, before Plaintiff became incarcerated, he was involved in a mishap that

---

[1]Many of the facts are taken directly from Defendants' Statement of Undisputed Facts [#26-1]. In that regard, although the Court must generally view the facts in the light most favorable to the non-moving party, Local Rule 56(a)(2) states that "[e]ach numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Moreover, Local Rule 5.2, entitled "Pro Se Actions," states in pertinent part as follows: "All pro se litigants shall become familiar with, follow, and comply with the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure, including those rules with special provisions for pro se litigants such as L.R.Civ.P. 1.3, 5.2, 5.5, 11, 16 and 54. Failure to comply with the Federal Rules of Civil Procedure and Local Rules of Civil Procedure may result in the dismissal of the case, with prejudice." Local Rule Civil Procedure 5.2(I). In the instant case, when Defendants filed the subject summary judgment motion [#26], they filed, *inter alia*, a Statement of Undisputed Facts, along with an *Irby* notice pursuant to Local Rule 56.2. Plaintiff's response [#27] includes a purported "Rule 56 Statement," but it consists primarily of conclusory assertions that Defendants are lying and that Plaintiff did not receive "proper medical care." To the extent that Plaintiff's response [#27] includes actual statements of fact, the Court has included them in its recitation of the facts.

resulted in a piece of glass puncturing his right foot.  Plaintiff had surgery to remove most

of the glass, but a small fragment remained after the surgery, near his fifth metatarsal (on

the bottom of the foot, behind the "pinky" toe).  At all relevant times Plaintiff has also had

other medical problems with his right foot, including an unusual arch, hammertoes and

painful hyperkeratotic calluses on the bottom of the foot near the first and fifth metatarsals

(behind big toe and "pinky" toe, respectively).

In November 2007, Plaintiff was received into DOCCS custody.  Subsequently, for

more than two years, there is no record of Plaintiff having made any complaints about

problems with his right foot.  However,

> [b]eginning in February 2010 Plaintiff began to see medical staff, complaining
> of pain in his foot.  This began a two-year long process of Plaintiff
> complaining of foot pain, receiving treatment in the form of medical pads and
> having calluses shaved and debrided[.]  After three to five months . . . Plaintiff
> would again seek and receive treatment.

> [Plaintiff posited that the pain was caused by the glass fragment, and] [o]n
> several occasions, [he] inquired about having surgery to [remove the foreign
> body].  X-rays repeatedly showed that the foreign body in Plaintiff's foot was
> not infected, and, therefore, unlikely to be the source of his pain.  Medical
> staff believed the calluses, not the glass, were source of Plaintiff's pain.
> [According to the medical staffs,] [t]he fact that pads and debriding Plaintiff's
> calluses caused pain to subside confirmed this diagnosis.  Medical staff,
> including a podiatrist who saw Plaintiff, opposed . . . surgery because, in their
> clinical judgment, any attempt to remove the foreign body would create more
> harm, in the form of nerve damage to foot, while not actually resolving
> Plaintiff's pain[.]

> [In June 2012, Plaintiff was released from DOCCS custody.]  In the three
> years since his release, Plaintiff has seen numerous podiatrists and doctors.
> These doctors have shaved and debrided Plaintiff's callouses and provided
> him with foot pads – the same treatment he received in prison.  Plaintiff has

still not had surgery to remove the glass.

Def. Rule 56 Stmt. [#26-1] at ¶ 4-6 (citations to record omitted).

With regard to the treatment that Plaintiff received at Collins, the record indicates that before he was transferred to Collins, he was housed at Livingston Correctional Facility ("Livingston").  On March 12, 2010, Livingston medical staff sent Plaintiff for x-rays, and the radiologist reported in pertinent part:

> Impression [:] Curvilinear opacity noted at the region of the fifth metatarsophalangeal  joint.  Please note that is only seen in one view. Artifact [error or distortion on the x-ray] may have a similar appearance.

In short, the radiologist indicated that it was unclear whether the x-ray showed a foreign body or merely an artifact, *i.e.*, a distortion or ghost image.  Nevertheless, on April 20, 2010, a doctor at Livingston referred Plaintiff to see a podiatrist regarding several problems with Plaintiff's right foot, including Plaintiff's complaint of a glass foreign body.  The referring doctor also reported that Plaintiff had a deformed fifth (pinky) toe due to an "old injury," as well as large painful calluses at the bases of his first and fifth toes, that were causing him to walk with an abnormal gait.

Before Plaintiff's appointment with the podiatrist could take place, he was transferred to Collins, where on May 19, 2010,  Dr. Jin reviewed Plaintiff's medical chart and cancelled the podiatric appointment.  As noted below, at that point in time Jin questioned whether Plaintiff actually had a foreign body in the foot, which may explain his decision to cancel the appointment.  On May 27, 2010, Jin trimmed Plaintiff's calluses, and noted, "Callus trimmed no complication."  Approximately two weeks later, on June 8, 2010, Plaintiff returned to sick call, complaining of foot pain and stating that he could "hardly walk," though he turned down

the nurse's offer of Tylenol.  The nurse reported that Plaintiff was asking to see an "outside specialist," but Jin wrote on the chart, "No podiatry consult!"  On June 21, 2010, Plaintiff again complained about calluses on his foot, and a nurse provided him with callus pads. On July 26, 2010, Plaintiff again complained of pain, which he attributed to the calluses and the glass foreign body, and the nurse noted that Plaintiff was limping.  It appears, though, that Jin wrote on the chart, "No intervention."  On August 3, 2010, a nurse reported that Plaintiff was complaining of "callus formation" at two spots on the bottom of his right foot, at the first and fifth metatarsals, and scheduled him for "callus trimming." On August 5, 2010, Jin reported that he trimmed Plaintiff's calluses, with "no complications," and that Plaintiff had a "steady" gait and "slight limp."  Jin added:  "No clinical indication for removal [of glass foreign body] which in fact may create more problems if attempt to remove this small FB if in fact it is a FB."

        On December 3, 2010, Plaintiff complained to a nurse about a callus on the outside of his right foot.  On December 6, 2010, Jin reported that he trimmed the callus with "no complication," and that he observed Plaintiff have "no difficulty" walking.  On March 7, 2011, Plaintiff asked a nurse to trim his callus.  The nurse appears to have indicated that s/he saw a "corn," but no callus.  On April 11, 2011, Plaintiff told a nurse that the callus on his right foot was "bothering" him.  The nurse reported seeing a "dime sized" callus behind the big toe, and a "pea sized" callus behind the pinky toe, and indicated that the doctor would shave the callus.  On April 15, 2011, Jin again shaved the callus and reported "no complication."  On July 5, 2011, Plaintiff complained to a nurse that he was having "severe pain" on the "bottom/lateral side" of the right foot, "where the glass is."  Plaintiff stated that, "It feels like I'm walking on the bone."  The nurse noted that an x-ray had identified a

foreign body, and referred Plaintiff to the doctor.

On July 12, 2011, Collins medical staff obtained additional x-rays of Plaintiff's right

foot, which confirmed the presence of a foreign body.  In that regard, the radiologist stated:

> The linear foreign body projects near the 5th metatarsal head.  This is
> consistent with a shard of glass, it measures 6 to 7 mm in length.  There are
> mild arthritic changes evident.  A normal plantar arch is maintained.  There
> is no indication of bone lysis or gas gangrene.  Impression:  Foreign body is
> documented.

On July 21, 2011, Jin again trimmed Plaintiff's calluses.  That same day, Jin referred

Plaintiff to see a podiatrist, for the purpose of having the piece of glass surgically removed.[2]

Jin's referral report stated in pertinent part:

> 52 yr old male with glass in right foot since 2006.  Progressively increased
> pain with walking.  Walks with limp and on medial right foot (glass overlie[s]
> the 5th mt [metatarsal] and approximately 3 cm deep).  Unable to palpate
> lesion.  Walking awkwardly has increased callous on medial right foot.
> Podiatry to remove fb [foreign body] under fluoroscopic guidance.

Docket No. [#9] at p. 12. On August 8, 2011, a nurse reported that Plaintiff was scheduled

to see a podiatrist on August 9, 2011.

On August 9, 2011, Robert Ciepiela, DPM ("Ciepiela"), a consultative podiatrist,

examined Plaintiff at Wende Correctional Facility.  Ciepiela noted that Plaintiff was

complaining of pain in the right foot, which Plaintiff attributed to the glass fragment.  Upon

examination, Ciepiela reported "large calluses" at submetatarsals 5 and 1.  Ciepiela further

stated that Plaintiff had "a higher arch," and that Plaintiff's "callus pattern" was "typical for

this type [of] foot."  Ciepiela indicated that x-ray showed a foreign body, but that that "FB

---

[2]See, Docket No. [#9] at p. 12 (DOCCS Request and Report of Consultation).

[foreign body] is asymptomatic."  Ciepiela debrided Plaintiff's calluses and prescribed him a pair of orthopedic boots.

On October 7, 2011, Plaintiff reportedly told a nurse that he had met with the podiatrist, but the podiatrist "made no recommendation for the glass in his foot."  On October 13, 2011, Jin noted that the "podiatrist will not remove glass [from the right] foot."  Jin requested an "orthotic cushion" for Plaintiff's foot.  On October 17, 2011, Jin again trimmed calluses on both sides of Plaintiff's right foot.  On November 18, 2011, Plaintiff asked a nurse why the podiatrist had not approved him for surgery to remove the glass.  On December 6, 2011, a nurse issued Plaintiff an arch support for his right foot.  On January 30, 2012, Plaintiff complained of increasing discomfort, and asked a nurse if he could have the callus on the outer edge of his right foot shaved, and said that such treatment "relieves pain when done."  On January 30, 2012, Jin again trimmed Plaintiff's calluses, on both sides (lateral and medial) of the right foot.  On March 5, 2012, Plaintiff told a nurse that he had two calluses on his right foot that needed trimming.  Later that same day, Jin trimmed the calluses and reported, "no complications."

On December 16, 2011, Plaintiff commenced this action.  Liberally construing Plaintiff's Complaint (Docket No. [#1]), it asserts the following points: 1) in 2010 at Collins, Plaintiff requested to be seen by a podiatrist, but Dr. Tan denied the request, purportedly because Plaintiff's x-ray did not show a glass fragment in his foot; 2) Plaintiff appealed Tan's decision, but Grievance Program Director Bellamy affirmed Tan's determination; 3)

Dr. Jin[3] agreed with Tan's decision not to remove the glass, and instead treated Plaintiff by shaving his calluses; and 3) DOCCS eventually referred Plaintiff to see Dr. Ciepiela, but Ciepiela did not remove the glass, but only shaved Plaintiff's calluses.  Although the caption of the Complaint lists DiNisio[4] and Samuelson[5] as defendants, the pleading contains no specific allegations about them.  In a later submission, Plaintiff indicated that he had written to DiNisio in connection with a grievance, and that DiNisio had written back to him and told him that surgery was not warranted in the opinion of his treating doctors.[6]  Plaintiff further indicated, though, that DiNisio later arranged for him to be examined by Ciepiela.[7]  As for defendant Samuelson, it appears that Plaintiff is suing her because, in her capacity as Nurse Administrator at Collins, she communicated with DiNisio when DiNisio was investigating Plaintiff's complaints.  More specifically, it appears that Samuelson advised DiNisio that testing had indicated that Plaintiff might have a piece of glass in his foot, but that the doctors had determined that surgery was not recommended because it might cause more damage.[8]  And finally, as to Bellamy, although Plaintiff contends that she "denied" his grievance, the correspondence that he has submitted indicates only that Bellamy advised him as to the procedures of the Inmate Grievance Program.[9]

---

[3]The pleading actually refers to a Dr. Koenigsman, not Jin, but the Court later determined that Plaintiff had mistakenly identified Jin as Koenigsman. *See*, Docket No. [#11].   Accordingly, the Court dismissed Koenigsman and substituted Jin.

[4]In a later submission [#9] Plaintiff indicated that he had written to DiNisio requesting surgery , and that on November 2, 2010, DiNisio had writen to him and stated that his x-ray "d[id] not reveal a definitive foreign body."

[5]Later, in response to Defendants' first summary judgment motion, Plaintiff clarified that he had written to Samuelson, but she never responded. See, Docket No. [#11].

[6]*See*, Docket No. [#9] at p. 1.

[7]*See*, Docket No. [#9] at p. 1.

[8]*See*, Docket No. [#9], attached exhibit, DiNisio letter dated November 19, 2010.  Elsewhere in the record, Plaintiff indicates only that he wrote to Samuelson and she did not respond. *See*, Docket No. [#11] at p. 3.

[9]*See*, Docket No. [#9]. Bellamy letters dated October 13, 2011 and December 5, 2011.

Shortly after Plaintiff commenced the action, Defendants filed a pre-discovery motion for summary judgment.   As part of that motion, Defendants' counsel submitted a declaration [#7] from Ciepiela, which states in pertinent part:

> On August 9, 2011, I examined Plaintiff, who complained of glass in his foot. After the examination, and reviewing a consult sheet and x-ray of Plaintiff's feet, *I found no evidence that Plaintiff had glass in his foot. . . .*  Because I found no evidence of glass in Plaintiff's foot, I determined a procedure to remove a foreign object was unnecessary and counterindicated.

(emphasis added).  The Court construes Ciepiela's last sentence to mean that if he had found evidence of glass in Plaintiff's foot, he would have found that a procedure to remove the foreign object was indicated.   However, Ciepiela's declaration appears to be inconsistent with his own treatment notes, since, as already noted ealier, on August 9, 2011 he indicated that x-rays showed a foreign body in Plaintiff's foot:  "FB [foreign body] per history + *x-ray.*" (emphasis added).

Partly because of this discrepancy between Ciepiela's declaration and his treatment note, and partly because the summary judgment motion was made prior to any discovery, the Court denied Defendants' application.[10]  With regard to Ciepiela's declaration, the Court stated:

> Ciepiela, in his affidavit [#10], maintains that after reviewing a consult sheet and x-ray of Plaintiff's foot, he found no glass in Plaintiff's foot and determined surgery was not necessary.  However, this appears to contradict the statements Ciepiela made in his medical report following his examination of Plaintiff, in which he stated that there was a foreign body in Plaintiff's foot,

---

[10]It is unclear to the Court why Defendants' counsel would have had Ciepiela execute a declaration that appears to contradict his notes.  In that regard, a positive x-ray is obviously "evidence" that a foreign body is present.  On the other hand, it may be that Ciepiela intended to say that he personally found no evidence that the foreign body was causing Plaintiff's pain.  However, the Court cannot resolve this discrepancy on a summary judgment motion.

but that it was asymptomatic.

Decision and Order [#12] at p. 14.

On July 22, 2015, after discovery was completed, Defendants filed the instant renewed motion for summary judgment.  In sum, Defendants maintain that even assuming *arguendo* that Plaintiff's medical condition was sufficiently serious to support an Eighth Amendment claim, they were not deliberately indifferent to such condition.  Instead, Defendants maintain that they provided Plaintiff with appropriate medical care, which consisted of trimming his calluses and providing him with callus pads.  Defendants contend that surgery to remove the glass was not warranted, because it could have caused more damage to the surrounding tissue, and because the treatment that was being provided relieved Plaintiff's pain.  Defendants have submitted an affidavit from Jin which states in pertinent part:

> [I]t became evident that surgery was not indicated – indeed surgery was far more likely to cause harm than help.  Surgery was unlikely to help resolve Plaintiff's pain, because nothing about the pain suggested it was being caused by the foreign body.  There was no infection and the foreign body itself was asymptomatic.  Surgery also carried numerous risks; in addition to the usual risks attending any surgery, the type of surgery sought by Plaintiff – a second surgery to remove an asymptomatic foreign body – carried with it a distinct risk of permanent nerve damage to the foot.
>
> ***
>
> Per Plaintiff's medical records, when he was examined in May 2010, staff found a very large callus overlying the right 5th metatarsal-phalangeal joint ('MTP').  A smaller callus was noted overlying the right 1st MTP.  Proper procedure was to debride (i.e. 'shave') the callus and provide medical pads for Plaintiff's feet.  If the pain subsided, this would confirm the diagnosis that the pain was being cause[d] by the calluses, and not the foreign body.  Plaintiff received proper treatment – the pads and debridement, and per his records, his foot pain subsided for several months, confirming the diagnosis.

Jin Declaration [#26-3] at ¶ ¶ 8-13.

Defendants, though, have submitted nothing from Ciepiela, and therefore have not attempted to clarify the apparent discrepancy between his declaration, submitted in connection with the prior summary judgment motion, and his medical notes.

In response to Defendants' motion,[11] Plaintiff generally alleges that several Defendants are "lying."  Plaintiff acknowledges, though, that the pain he attributes to the foreign body began in February 2010, which is approximately four years after the glass became embedded in his foot.[12]  As for the relevant time that Plaintiff was confined at Collins, he states in conclusory fashion: "All the time I was he[re] at Collins CI I suffer[ed] an[d] was in pain."[13]  However, Plaintiff has not disputed the entry in the medical record, in which he told medical staff that shaving his calluses relieved his pain.

Plaintiff also does not dispute that he has seen multiple doctors and podiatrists since being released from prison.  The first two podiatrists to treat Plaintiff after he was released provided or proposed essentially the same treatment that he received at Collins – treatment of the calluses as opposed to treatment of the foreign body.  One of those podiatrists, Simon Nzuzi, DPM ("Nzuzi"), trimmed Plaintiff's calluses and provided him with callus pads, after which, on October 23, 2012, Plaintiff indicated that the "padding applied by Dr. Nzuzi last week was so effective that it relieved the pain and he kept it on all week."[14]  However,

---

[11]In considering Plaintiff's response to the subject summary judgment motion, the Court has considered not only what he submitted [#27] in direct response to the motion, but also what he submitted [#9][#11] in response to Defendants' original summary judgment motion.

[12]See, Docket No. [#27], Rule 56.2 Notice at p. 1 ("Beginning in February 2010 my foot started to cause me problems.").

[13]Docket No. [#9] at p. 3.

[14]Nzuzi's office notes further indicate that he was planning to obtain an ultrasound to "evaluate" the foreign body, but it does not appear that such testing was ever performed. See, Nzuzi office noted dated November 27, 2012.

Plaintiff contends that Defendants' submission fails to mention a third post-prison podiatrist, Hirunnisha Najjar, D.P.M. ("Najjar"). Plaintiff indicates that he and Najjar "did talk about the glass in [his] foot and surgery to remove it." (Docket No. [#27] at p. 1). Plaintiff has submitted a photocopy of a "Patient Excuse Letter" from Najjar, which is unfortunately so faint as to be almost illegible.[15] However, the note appears to indicate that Plaintiff consulted with Najjar concerning two problems, "hammertoes" and "foreign body," and that Najjar may have recommended surgery; at least, there is some reference to a "surgical consult."[16] Although, the note does not indicate whether the proposed surgery was related to the hammertoes, the foreign body, or both. Plaintiff also offers a hearsay statement, that "a podiatrist," apparently meaning Najjar, told him that "if the glass was removed when [he] was incarcerated," he "would of had a better chance of them getting the glass out without the glass going further in [the] foot near [the] nerves."[17] The record, though, does not indicate any basis for such an opinion, since there is no evidence that the piece of glass has ever moved within Plaintiff's foot, or that it has caused any nerve damage.

ANALYSIS

### *Rule 56*

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of

---

[15] A Court staff member called Najjar's office and requested a copy of the document, which is dated July 31, 2015. The receptionist indicated that Plaintiff was seen as a patient on that date, but that there was no copy of the Patient Excuse Letter in his file.

[16] *See*, Docket No. [#27] at p. 10.

[17] *See*, Docket No. [#27] at p. 7.

establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Moreover, since Plaintiff is proceeding *pro se*, the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

13

Section 1983

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See, e.g.*, *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004).

Deliberate Medical Indifference

Plaintiff alleges that Defendants violated his Eighth Amendment rights in connection with his medical treatment, and the legal standard for such claims is clear:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.
>
> Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering.  Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations

omitted).

Significantly, an inmate cannot establish an medical deliberate indifference claim simply because he disagrees with the type of treatment that he received.  To the contrary, courts have repeatedly held that disagreements over treatment do not rise to the level of a constitutional violation. See, *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Similarly, negligence constituting medical malpractice, without more, will not establish a constitutional claim. *Id.* (citation omitted).

On the other hand, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (citations and internal quotation marks omitted).  In that regard, "whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.* Where an inmate plaintiff maintains that a doctor chose "an easier and less efficacious treatment" based upon an ulterior motive, he must come forward with some evidence of such a motive. *Id*. at 704.

In this case, there is no dispute that a piece of glass is embedded in Plaintiff's foot. Rather, the dispute is whether Defendants violated Plaintiff's federal constitutional rights by declining to remove the glass.  In that regard, Plaintiff does not dispute that the medical staff at Collins treated him on numerous occasions by trimming his calluses and providing him with callus pads and orthotics, or that he indicated on at least one occasion that such treatment effectively relieved his pain.  Instead, Plaintiff argues that Defendants should have surgically removed the glass.  However, in support of Defendants' motion, Jin

15

indicates that it was his medical judgment that such surgery was unnecessary, and could have caused more serious problems such as nerve damage.  As support, Jin indicates that he believed that Plaintiff's pain was being caused by the calluses, and not the glass, since Plaintiff reported relief after having the calluses trimmed.  Jin further notes that the glass foreign body was not infected.  In any event, when Plaintiff continued to complain, Jin arranged to have Plaintiff seen by Ciepiela, a podiatric specialist, who agreed that surgery was not warranted.  Although Plaintiff disagrees with Jin's assessment, he has not come forward with evidentiary proof that raises a triable issue of fact as to whether the medical staff at Collins improperly chose an easier and less efficacious treatment.[18]  Nor, for the reasons discussed above has Plaintiff created a triable issue of fact as to whether the medical staff at Collins improperly delayed treatment.  Nor has Plaintiff shown that the DOCCS supervisory personnel whom he has sued (Tan, DiNisio, Bellamy and Samuelson) violated his Eighth Amendment rights.

However, the Court finds that summary judgment must again be denied as to Ciepiela, since there remains is a triable issue of fact as to why he declined to operate. As already discussed, Ciepiela's contemporaneous notes indicate that he did not operate because the glass foreign body was asymptomatic, while his more recent declaration indicates that surgery was not warranted because he "found no evidence of glass in

---

[18] *See, Young v. Smith*, No. 07-CV-6312 CJS, 2009 WL 3733048, at *6 (W.D.N.Y. Nov. 5, 2009) ("Plaintiff further maintains that [Dr.] Coniglio chose an 'easier and less efficacious treatment plan,' by removing pieces of the patella, rather than attempting to graft the broken pieces together or providing a prosthetic patella. However, Coniglio maintains that the pieces of bone that he removed were small pieces of "comminuted bone," which were "necrotic," and which "had to be removed," and that a prosthetic patella could not be utilized without a knee replacement. Although Plaintiff disagrees with both contentions, the unsupported opinion of a layman such as Plaintiff is not sufficient to raise a triable issue of fact on a medical issue of this nature.") (citation and footnote omitted).

Plaintiff's foot."[19]  Ciepiela has therefore not shown that he is entitled to judgment as a matter of law.

CONCLUSION

Defendants' summary judgment motion [#26] is granted as to Tan, Jin, DiNisio, Samuelson and Bellamy, and the Clerk of the Court is directed to terminate them as defendants.  Defendants' application [#26] is denied as to Ciepiela.  Accordingly, the matter will proceed to trial just on the claim against Ciepiela.

SO ORDERED.

Dated: Rochester, New York
         January 6, 2016

                                    ENTER:


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge

---

[19]This issue of fact was not created until May 2, 2012, when Ciepiela executed his affirmation on that date, long after this action was commenced.  Accordingly, such issue of fact does not cast doubt on the propriety of the other defendants' actions towards Plaintiff.